# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

PAUL GRAHAM MANNING,                    )
                                        )
     Petitioner,                    )     No. 2:05-0024
                                        )     JUDGE HAYNES
v.                                      )
                                        )
GLEN TURNER, Warden                     )
                                        )
     Respondent.                    )


## M E M O R A N D U M

Petitioner, Paul Graham Manning, filed this action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his state convictions of first degree murder and felony reckless endangerment for which he received an effective sentence of life imprisonment with the possibility of parole. After a review of the pro se petition, the Court appointed the Federal Public Defender who filed an amended petition. (Docket Entry No. 39). Despite the Court's earlier instructions not to file pro se documents because he is represented by counsel (Docket Entry No. 24), Petitioner filed an amended pro se petition. (Docket Entry No. 43).

Petitioner's original pro se petition asserted the following claims: (1) actual innocence; (2) the State's conspiracy to convict the petitioner; (3) prosecutorial misconduct; (4) ineffective assistance of counsel; (5) judicial misconduct/abuse of discretion; (6) illegally seized/false arrest; (7) unlawful search/illegally seized personal property; (8) excessive bail; (9) cruel and unusual punishment; (10) denied the right to subpoena witnesses and present evidence; (11) speedy trial; (12) denied the right to call witnesses; (13) denied expert assistance; (14) ineffective assistance of counsel; (15) the right to have the jury presented with all the facts; (16) denied the right to a

fair trial based on a conspiracy by the prosecutor; defense counsel and judge; (17) denied the right to present a defense; (18) insufficiency of evidence; (19) due process; (20) ineffective assistance of counsel at the motion for new trial and on appeal; and (21) denied the right to petition the government for the redress of grievances.

Petitioner's amended petition filed by his counsel supplants the original petition[1] and asserts the following claims: (1) ineffective assistance of counsel; (2) Petitioner's lack of competency to stand trial; (3) erroneous jury instruction on first-degree murder; and (4) the State prosecutor's withholding of material and exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The specifics of these claims are as follows:

> Among other failings, defense counsel:(1) inappropriately deferred to Manning on various matters of trial strategy even though Manning was either incompetent or marginally competent, was possibly mentally ill, and showed signs of delusional thinking; (2) failed to adequately challenged Manning's competence to stand trial; and (3) failed to adequately investigate the incident resulting in Jackie Manning's death, his client's mental state at the time of the incident, or his client's mental state and potential incompetency at the time of trial; and (4) failed to put on all

---

[1]The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005) ; Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the pro se petition. The amended petition adopts and incorporates by reference the claims in the state courts and the original pro se petition filed in this action, but does not brief nor present argument on all of those claims. Those claims that are not briefed are deemed waived. See United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). To be sure, Petitioner subsequently filed a pro se "revised amended petition" (Docket Entry No. 43) with essentially the same claims in his original petition. A party who has counsel cannot file separate papers, United States v. Howton, 229 Fed. Appx. 362, 370 (6th Cir. 2005), including in habeas actions. Keenan v. Bagley, No. 1:01CV2139, 2010 WL 1133238, at *1 (N.D. Ohio 2010); Adams v. Schwartz, No. CIV S-05-2237 RRB JFM P, 2008 WL 217514, at *1 (E.D. Cal. 2008). Thus, the Court considers only claims briefed in the amended petition filed by his counsel and his counsel's response to the Respondent's motion to dismiss.

supporting evidence that Manning was not guilty of first degree, intentional premeditated murder.

*   *   *

Manning was not competent to stand trial at the time his case was finally tried before a jury in March of 2001. He did not have the ability to consult with his lawyer with a reasonable degree of rational understanding and his lawyer was thus hampered in his ability to provide effective presentation. As a result, Manning's trial violated due process.

*   *   *

In violation of due process under the Fourteenth Amendment, Manning was convicted of first-degree murder based upon a concededly erroneous instruction on the essential element of 'intentional,' which allowed the jury to convict him of first degree murder by finding that he merely had a 'conscious objective or desire to engage in the conduct' which caused the victim's death, viz. shooting, without requiring that he actually had a specific intent to kill the victim.(*See* Trial Tr. 403, 405-406.) By allowing the jury to find an intentional killing based solely on an objective to shoot the firearm, the jury instruction was erroneous and relieved the prosecution of its constitutional burden of proving all elements of first degree murder beyond a reasonable doubt.

*   *   *

Here, the State withheld material exculpatory evidence that the conclusions of its medical examiner, Charles Harlan, were unreliable and that Dr. Harlan testified falsely that he had performed 27,500 autopsies. On information and belief, the State also withheld material exculpatory evidence undermining its theory that Manning acted intentionally and with premeditation.

(Docket Entry No. 39, Amended Petition at pp. 4, 5 and 6).  In addition, in his response to the Respondent's motion to dismiss, Petitioner also asserts claims that his counsel "improperly stipulated to the admission of medical records at trial," "failed to point out discrepancies in the medical records," and failed to challenge judicial and prosecutorial misconduct concerning subpoenas of medical witnesses, including Dr. Barker, who signed the death certificate.  (Docket Entry No. 57, Response at pp. 3-5).

3

Before the Court is Respondent's motion to dismiss (Docket Entry No. 49), contending in sum: (1) that Petitioner has failed to show that the state courts' rulings were unreasonable applications of federal law or unreasonable determinations of the facts in the State court proceedings; (2) that Petitioner's unexhausted claims are procedurally defaulted; and (3) that Petitioner's remaining claims fail to provide proper support and argument and should be dismissed. Petitioner responded and also filed a motion for evidentiary hearing. (Docket Entry No. 57). Before addressing the Respondent's motion to dismiss, the Court addresses Petitioner's motion for an evidentiary hearing that may impact the evidence to be considered on the merits of his claims.

## A. REQUEST FOR AN EVIDENTIARY HEARING

Petitioner contends that "he is entitled to present evidence at a hearing to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." (Docket Entry No. 57 at p. 7). Petitioner also asserts that he "requested subpoenas of medical witnesses that were critical to his contention that the State could not show beyond a reasonable doubt that medical records showed what treatment the victim received and the outcome of her wounds." Id. at 4. Petitioner contends that the state court denied him his Sixth Amendment right of confrontation by not compelling the testimony of Dr. Barker who purportedly signed the death certificate.

For an evidentiary hearing in a habeas action, in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress redefined the standards:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was

4

previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C.§ 2254(e)(2).

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court explained that if the petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the focus is on whether the petitioner or his counsel knew of the matters at issue and fail to pursue the matter:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his effort . . . Diligence for purposes of the opening clause [on Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.
>
> *   *   *
>
> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.  Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings. Yet, comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort.  In that circumstance, an evidentiary hearing was not barred by § 2254(e) (2).

Id. at 435, 437.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. Abdur' Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir.

5

2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Id. at 705. Such hearings are set "to settle disputed issues of fact." Id. at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing, but [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing on the applicant's constitutional claim." Id. (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exist, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to ADEA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold an evidentiary hearing," Kenney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent authority to order a hearing [that] is still intact following Williams." Rahman, 226 F.3d at 706.

Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d 614, 626-27 (6th Cir. 2005).

6

Petitioner's state trial and post-conviction counsel raised the subpoena issues that are the bases for Petitioner's motion for an evidentiary hearing. The state trial courts held evidentiary hearings in both proceedings. These subpoena issues were first addressed in Petitioner's direct appeal.

> At the hearing on the motion to quash, defense counsel explained that the witnesses were necessary to explain discrepancies in the medical records generated in conjunction with the victim's emergency treatment and death. As examples of the discrepancies, defense counsel pointed out differences in the operating room numbers and a discrepancy in the time of death. Two different doctors apparently "signed off" as chief surgeon. The trial court determined that the medical records would be admitted at trial and that "any discrepancies can be pointed out by anyone," rendering the presence of the medical personnel "unnecessary." The court explained that, even if the witnesses "freely admit [ted] that somebody made an error in the record[,][t]hat would have very little bearing upon what the crux of this case is, and that's whether or not the deceased is dead and who was the cause of the death." The trial court specifically stated that it "[did not] see that [the Defendant's] defense is jeopardized by the State's motion to quash."

> We acknowledge, of course, that defendants to criminal prosecution have the right under both our federal and state constitutions to compulsory process for obtaining witnesses in their favor. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right is further codified in our criminal code. See Tenn.Code Ann. § 40-17-105. The right, however, is not absolute. As previously recognized by this Court, "the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible." State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App.1982) (quoting Bacon v. State, 215 Tenn. 268, 385 S.W.2d 107, 109 (1964)). Thus, trial courts have "the power and the duty to prevent abuse of [their] process by abating subpoenas for witnesses whose testimony would be immaterial." State v. Womack, 591 S.W.2d 437, 443 (Tenn. App. 1979). In reviewing a trial court's exercise of its power and duty to prevent abuse of its process, this Court applies an abuse of discretion standard. See State v. Connie Easterly, No. M2000-00077-CCA-R10-CO, 2001 WL 208514, at *7 (Tenn.Crim.App., Nashville, Mar. 1, 2001).

> The Defendant has failed to demonstrate that the trial court abused its discretion in quashing his subpoena for the attendance of numerous medical personnel. The victim's daughter testified that she saw the victim's body, made the funeral

7

arrangements, and attended the funeral. A certified copy of the victim's death certificate was admitted at trial. There was no proffer of proof at trial that any of the witnesses attempted to be subpoenaed by the Defendant would have cast any doubt on the victim's death. In short, the Defendant has failed to demonstrate that any of these witnesses would have offered material evidence and has failed to demonstrate that the trial court thereby abused its discretion in quashing his subpoena. Accordingly, this issue is without merit.

State v. Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *10-11 (Tenn. Crim. App. Feb. 14, 2003) perm. to app. denied (Tenn. Dec. 15, 2003). Seven witnesses whom Petitioner sought to subpoena, actually testified as state witnesses in his trial. Manning, No. M2005-028-76-CCA-R3-PC, 2007 WL 4116487 at **10-12 (Tenn. Ct. Crim. App. Nov. 13, 2007).

In his post conviction proceeding, the state trial court held another hearing on the subpoena issues, as described by the Tennessee appellate court.

Petitioner argues that he was denied a full and fair post-conviction hearing primarily because the trial court denied his request to subpoena certain witnesses to testify on his behalf at the evidentiary hearing. Petitioner insists that his right to subpoena witnesses is "a guaranteed mandatory right, and the court has no discretion as to choosing who the petitioner can or cannot subpoena to testify on behalf of the petitioner." Petitioner contends that his limitation on presenting a defense was "the prevalent issue in the entire case."

Prior to the evidentiary hearing, Petitioner filed a request for the issuance of subpoenas to over fifty potential witnesses including fifteen members of the Erlanger Hospital staff and air medical emergency team, the district attorney's staff, various physicians involved in Petitioner's psychiatric treatment, and the trial judge. The State filed a motion to quash the subpoenas for all but twenty-two of the witnesses. The trial court entered an order requesting Petitioner to file an affidavit stating the substance of the proposed testimony for each witness. Petitioner's affidavit filed in response to the trial court's order states that the expected testimony of the requested witnesses will be "as to the ( *actual, factual, life or death* ) of ( *Jackie Smart Manning* ), who is the wife of the accused, and the factual circumstances of the actions taken or not taken, by all individuals who were supposedly involved in the actual and factual life or death, and the resulting consequences of each individual's participation." Petitioner had sought to

8

subpoena many of these same witnesses at trial, but the trial court granted the State's motion to quash the subpoenas.

The trial court conducted a lengthy hearing concerning the proposed testimony of each of the witnesses Petitioner wished to subpoena to testify at the evidentiary hearing. The trial court informed Petitioner at the commencement of the motion hearing that he could call a witness to support a claim that trial counsel's performance was deficient either in his cross-examination of the witness or for failing to call the witness to testify at trial, or if the witness's testimony was relevant to Petitioner's allegation of a conspiracy.

Petitioner's purpose in calling the requested witnesses alternated from giving the witness a chance "to clear" his or her name after presenting "perjured" testimony, to verifying "under oath" the accuracy of the information contained in various medical reports generated during the victim's medical treatment prior to death. He suggested that other witnesses would testify that he and the victim were amicable before her death, and he wanted the opportunity to question his psychiatrists as to the reason why he was given pyschotropic drugs while involuntarily committed. The trial court concluded that any witness whose proposed testimony was relevant to Petitioner's ineffectiveness of counsel and conspiracy claims would be subpoenaed to testify. The post-conviction court granted the State's motion to quash the remaining witnesses whom Petitioner wished to call to testify on matters not related to his post-conviction claims.

Underlying Petitioner's claim that he was denied a full and fair post-conviction hearing because of the trial court's partial grant of the State's motion to quash is his belief that the issue of the victim's death has not been previously determined. Citing Tennessee Supreme Court Rule 28(2)(E), Petitioner asserts that "[a] claim for relief is previously determined only if a court of competent jurisdiction has ruled on the merits of the claim after a full and fair hearing at which petitioner is afforded the opportunity to call witnesses and present evidence." Tenn. R.S.Ct. 28(2)(E). Petitioner asserts that in this case, the issue was not previously determined at the trial level because the trial court "illegally quashed" his subpoenas for certain "material witnesses," thereby denying his right to a full and fair trial. Because he did not have what he considers a fair trial, Petitioner contends that he is not precluded from raising issues other than those cognizable in a post-conviction proceeding during the evidentiary hearing.

\* \* \*

The post-conviction court found that Petitioner had failed to establish that the witnesses in question were material to the specific issues. Accordingly, we find

9

no abuse of discretion in the trial court's granting the State's motion to quash the subpoenas at issue.

Manning, 2007 WL 4116487 at **10-12.

Petitioner fails to offer any proof that any of the witnesses who were not called would have presented favorable testimony. As the Tennessee appellate court observed, all of these evidentiary issues "stem essentially from his unwavering conviction that his wife, the victim in this case, is not dead. To that end, Petitioner contends that all actions taken by the trial court, the prosecution, the defense team, and the post-conviction court which contradict the existence of this fact violated Petitioner's constitutional rights to a fair trial and his ability to present a defense." Id. at 4. Ample evidence established that the victim was in fact dead. The victim's daughter testified that she saw the victim's body, made the funeral arrangements, and attended the funeral. The medical examiner also testified that the victim was dead.

Petitioner also asserts that under Melendez-Diaz v. Massachusetts, 557 U.S. ___, 129 S.Ct. 2527 (2009), certificates of laboratory reports and death certificates are subject to Sixth Amendment scrutiny. Petitioner's reliance on Melendez-Diaz is misplaced. In Melendez-Diaz, the Supreme Court stated that "medical reports created for treatment purposes. . .would not be testimonial under our decision today." Id. at 2533 n.2. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." Williams v. Taylor, 529 U.S. 362, 390 (2000); accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). Petitioner's conviction became final in 2003 and Melendez-Diaz is inapplicable here.

In sum, Petitioner had a full opportunity at his trial and in his post-conviction proceedings to develop the facts for these contentions in the State courts. There is not any showing of

10

specific facts that Petitioner would present at the evidentiary hearing requested in this action. Thus, Petitioner's request for an evidentiary hearing is denied.

## A. PROCEDURAL HISTORY

On March 8, 2001, Petitioner was convicted of first-degree murder and felony reckless endangerment for which he received a life sentence with the possibility of parole on the murder count and two years concurrent sentence for the reckless endangerment conviction. On February 14, 2003, the Tennessee Court of Criminal Appeals affirmed his conviction and the Tennessee Supreme Court denied his application for permission to appeal on December 15, 2003. State v. Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510 (Tenn. Crim. App. Feb. 14, 2003), perm. to app. denied (Tenn. Dec. 15, 2003).

On January 2, 2004, Petitioner filed a state post-conviction petition for which the trial court held an evidentiary hearing, and on October 27, 2005, the trial court denied the petition. On November 13, 2007, the Tennessee Court of Criminal Appeals affirmed the trial court order and on April 7, 2008, the Tennessee Supreme Court denied his application for permission to appeal. Manning v. State, No. M2005-02876-CCA-R3-PC, 2007 WL 4116487 (Tenn. Crim. App. Nov. 13, 2007). Petitioner also filed a petition for writ of error coram nobis that the trial court denied and the Tennessee Court of Criminal Appeals affirmed that order of denial on February 7, 2008. Manning v. State, No. M2007-00374-CCA-R3-CO, 2008 WL 343128 (Tenn. Crim. App. Feb. 7, 2008).

Petitioner filed his pro se federal habeas petition on March 22, 2005. On March 29, 2005, the Court appointed counsel to represent Petitioner. This action was held in abeyance on March

11

5, 2007, pending the resolution of Petitioner's state post-conviction petition. On June 19, 2008, the Court entered an order reopening Petitioner's habeas proceedings. (Docket Entry No. 28).

## B. REVIEW OF THE STATE COURT RECORD

As to the facts underlying Petitioner's conviction, the Tennessee Court of Criminal Appeals found[2] as follows:

On the night of December 15, 1997, the Defendant and his wife, Jackie Manning, attended a basketball game in which their son, fourteen-year-old Josh Manning, was playing. On their way home, the Defendant stopped at a liquor store and purchased a fifth of whiskey. According to Josh, the Defendant began drinking the liquor as soon as he returned to the car.

When the family got home, Josh went to his room and eventually to bed. He was awakened later by the sounds of his parents arguing. Josh testified that he heard the Defendant say something about getting a gun. Josh then heard his father go to the closet where he kept his shotgun. Alarmed, Josh got up and went into the living room. He saw his father seated on the couch with the shotgun nearby; his mother was standing at the front door to the house, directly across from the couch. Josh testified that the Defendant was accusing his wife of infidelity and calling her vulgar names. Josh began arguing with the Defendant, telling him to leave his mother alone. Josh told the Defendant that "he thought he was big and bad because he had a gun." In response to this taunt, the Defendant fired the shotgun over Josh's head, striking the wall. A pellet from the blast grazed Josh's cheek. The Defendant then stated, "That proves my point."

Following the shot Mrs. Manning stated, "I can't take this anymore" and began to turn to leave the house. According to Josh, the Defendant responded by saying, "If you move another inch, I'll blow your head off." As Mrs. Manning continued her attempt to leave the house, the Defendant fired the gun again. Mrs. Manning fled outside, and Josh ran out to check on her. Josh found his mother lying on the ground with a gunshot wound to her torso.

Josh returned to the house to call 911. He found the Defendant in the Defendant's bedroom gathering more shotgun shells. Josh begged the Defendant not to get any more shells, and the Defendant eventually dropped the ones he already had in his hand. Josh called 911. While Josh was speaking with the dispatcher, the

_____

[2]State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d) with a statutory presumption of correctness. <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981).

12

Defendant yanked on the phone wires leading to the wall jack, disconnecting the call.

Josh told the Defendant that he (the Defendant) had shot the victim and that he (Josh) had to call 911. Josh took the gun from the Defendant, and the Defendant went outside. Josh hid the shotgun under his bed and again called 911 on the cordless headset of the phone. Josh told the 911 dispatcher that his father had shot his mother, but he said that the shooting had been accidental. At trial, Josh explained that this report was not true, but that he was afraid to report the shooting as deliberate. He subsequently told investigating officer Billy Miller that the shooting had not been accidental, and he reiterated this at trial.

Josh returned to his mother and found the Defendant with her. Josh testified that he heard the Defendant say, "Oh, my God. What have I done? Help, help; somebody help. I'm sorry; I'm sorry." Josh testified that he "guess[ed]" his father was drunk that night, and he further testified that the Defendant did not initially realize that he had shot his wife. When Josh found the Defendant with Mrs. Manning, the Defendant was applying pressure to the gunshot wound and was crying and upset. The Defendant told Josh at that point to call 911.

Officer Miller testified that when he arrived on the scene, the Defendant was crouched over Mrs. Manning, saying "I'm sorry" and "help her." Josh told Officer Miller that the Defendant had shot at him and then shot his mother. Josh showed Officer Miller where he had hidden the gun, and Officer Miller confiscated the weapon, a 12 gauge shotgun. Officer Miller also recovered from the living room three shotgun shells and two empty shell cartridges. He took photographs of the hole in the wall occasioned by the Defendant shooting over Josh's head. Officer Miller testified that the Defendant was "combative and upset" at the scene but did not appear drunk. Officer Miller stated that the Defendant appeared to know what was going on.

After the Defendant was taken into custody, he gave a short statement to Officer Miller. According to Officer Miller, the Defendant told him that he had been asleep that night and "heard a pop. He got up, walked outside and saw his wife, Jackie, laying in the driveway and stayed there with her until somebody came. He didn't know who they was [sic], who it was that responded, and he said at that point in time he did not remember anything else." The Defendant told Officer Miller nothing else about the incident.

Officer Miller performed a gunshot residue test on the Defendant, but this occurred fifteen or sixteen hours after the shooting. TBI forensic scientist James Russell Davis II testified that the test results were "inconclusive," but he explained that the length of time between the gun being fired and the test being

13

performed was "very important." He testified that a long-barreled gun also reduced the chances of the test being positive.

TBI forensic scientist Donald I. Carman testified that the empty shell casings recovered from the scene had been fired from the shotgun recovered from the scene.

Dr. Charles W. Harlan performed the autopsy on the victim and testified that she died as the result of a shotgun wound to her abdomen. Dr. Harlan recovered multiple shotgun pellets from the victim's body. He testified that the distance from the shotgun to the victim at the time of firing was probably four to six feet, more probably six feet.

Cindy Krupp, the 911 dispatcher who took Josh's calls, testified that the first call came in at about 11:55 p.m. on December 15, 1997. She explained that a boy stated that his mother had been shot and they needed an ambulance. During the call, the phone went dead; however, the caller called back "seconds later." Ms. Krupp confirmed that the caller had described the shooting to her as accidental.

Stephanie Lee, the victim's daughter, testified that her mother and the Defendant began living together when she was in the third grade. She stated that there was a lot of arguing, that the Defendant was "very, very, very jealous," and repeatedly accused the victim of cheating on him and lying to him. Ms. Lee testified that it was common for the Defendant to tell the victim, "If you ever leave me, I'll kill you." Ms. Lee explained that she left the couple when she was thirteen or fourteen to go live with her father. She explained that she left to avoid the constant fighting between her mother and the Defendant.

The Defendant testified that he did not know how his wife came to be shot. He explained that he "woke up" beside her on the ground in the driveway. He stated that he "rolled over and put [his] arm around her and when [he] did that [he] felt the wound." He explained that he "held the wound" and that it was "devastating" to him: "the most traumatic moment in [his] whole life." He testified that the last thing he remembered before waking up was setting his drink on the night stand. He explained that, while Josh was making the second 911 call, he "was in a mental state that [he] couldn't hardly keep conscious. It was all [he] could do to keep [his] mind. [He] kept going in and out conscious, like [he] was drugged or something." With respect to Josh's testimony, the Defendant testified, "I don't remember any incident that he's testified to. I don't have any recollection to that whatsoever." On cross-examination the Defendant stated that he "didn't pull the phone jack out" and that Josh was lying about that. He further stated that he "didn't get a gun that night."

14

The Defendant admitted on cross-examination that he wrote letters to Josh after his arrest that included the following statements:

> If they prove that I didn't do it, you'll be the number one suspect.

> And they'll come and get you and jail you for first degree murder and put you away for the rest of your life.

> I have a lawyer who will come to see you and tell you exactly what to do.

> I have not told the cops anything and even haven't told my lawyer all I know.

> You may think all is well but I can assure you that you are in for some surprises if you don't listen to me.

> I am your dad and I love you, but I won't take a 15 to 25 year sentence for you.

The Defendant denied that he was trying to get his son to admit to the killing, and he testified that he "was trying to get him to keep his mouth shut." The Defendant maintained his lack of recollection of the events surrounding his wife's death, but he stated that "I don't think I shot her at all." He claimed to have taken a "truth serum test" that indicated that, "if I did shoot my wife, it was probably an accident." No further evidence of this "test" was proffered. The Defendant also admitted on cross-examination that his statement to Officer Miller had been false.

State v. Manning, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *1-3 (Tenn. Crim. App. Feb. 14, 2003) perm. to app. denied (Tenn. Dec. 15, 2003). The other pertinent findings of the Tennessee appellate court on Petitioner's state post-conviction petition will be presented in the context of Petitioner's specific claims.

## C. CONCLUSIONS OF LAW

Actions under 28 U.S.C. § 2254 are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997).

15

Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their

merits in a state court proceeding unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of the United States;
> or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in
> light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court stated that a state

court judgment is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court

may grant a writ. Id. at 413. The Supreme Court interpreted the language "clearly established

Federal law, as determined by the Supreme Court of the United States" as referring to "the

holdings as opposed to the dicta" of its decisions at the time of the state court decision. Id. at

412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the

time [the Petitioner's] state-court conviction became final." Id. at 390; accord Joshua v. DeWitt,

341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court

reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications

"in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given

effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court

judgment results in an "unreasonable application" of clearly established federal law "if the state

16

court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. "Even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable." Cristini v. McKee, 526 F.3d 888, 897 (6th Cir. 2008). The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

For habeas relief, all federal law claims must be fairly and properly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Anderson v. Harless, 459 U.S. 4, 7 n.3 (1982) (per curiam). As to how the facts and federal legal theory must have been "fairly presented" to the state courts, in Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard and Anderson), the Supreme Court stated: "If state courts are to be given the opportunity to correct alleged violations of prisoners, federal rights, they must surely be alerted to the facts that the prisoner are asserting claims under the United States Constitution." Id. Duncan modified and heightened the standard set by Picard. Id. at 367. (Stevens J., dissenting)

If a properly presented federal law claim is not adjudicated in state courts, the AEDPA is inapplicable. Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003). In such instances, the Court "'reviews questions of law and mixed questions of law and fact de novo.'" Id. (citations omitted). If a state court decides a federal law claim, but "does not squarely address the federal

17

constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis, we must carefully review both the record and the applicable law, and may reverse only if we conclude that the State recent decision is contrary to or an unreasonable application of federal law." Filiaggi v. Bagley, 445 F.3d 851, 854 (6th Cir. 2006) (quoting Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005). In any event, this modified AEDPA standard "[n]onetheless bars the court from reversing unless the state's court's decision is contrary to or an unreasonable application of federal law.'" Maldonado, 416 F.3d at 476.

### 1. Ineffective Assistance of Counsel Claims

As to his ineffective assistance of counsel claim, Petitioner asserts that his counsel failed to investigate his case properly, improperly stipulated to the admission of the victim's medical records and failed to complain about prosecutorial misconduct. The state appellate court's factual findings on this claim were as follows:

> Petitioner's trial counsel testified that he represented Petitioner from 1997 until 2001. Trial counsel conducted a thorough investigation and reviewed all of the evidence with Petitioner prior to trial. Trial counsel created a synopsis, or "cheat sheet," of the evidence because Petitioner was concerned about several "minor inconsistencies" in the evidence, particularly the victim's medical records, and wanted those inconsistencies highlighted at trial. Trial counsel stated that Petitioner insisted that trial counsel stipulate to the introduction of the hospital records as an exhibit at trial because Petitioner wanted to expose the "lies" in the records as support for his conspiracy theory.

> Trial counsel said that he spent a minimum of 150 hours reviewing the case with Petitioner and met with Petitioner seven of the ten days preceding the trial. In the five days immediately prior to trial, counsel met with Petitioner a minimum of five hours each day. The last three days preceding trial, he spent eight hours each day with Petitioner.

> Trial counsel said that Petitioner insisted on undergoing a "truth serum" test despite counsel advising against the test. According to counsel, nothing was revealed through the test because "it was just gibberish." Trial counsel also

18

advised against Petitioner requesting that the contents of the glass Petitioner was drinking from on the night of the incident be tested for drugs. Trial counsel said that he explained to Petitioner that any negative results would only help the State's case. Nonetheless, Petitioner demanded that the contents of the glass be tested because he believed someone had drugged him prior to the shooting. The results of the test were negative for any drugs.

Trial counsel stated that he advised Petitioner that he should present a defense based on an accidental shooting to establish that Petitioner was at most guilty of reckless homicide. He also suggested a defense of diminished capacity. Petitioner refused to accept trial counsel's suggested defenses. Petitioner insisted that he was drugged, not drunk, at the time of the shooting, that his wife was not dead, and that there was no way the events could have occurred in the manner described by the police and medical attendants. Trial counsel said that Petitioner "kept telling [trial counsel] that [Petitioner] would let [him] know what the defense [was] going to be when [he] took the stand, and that certain things would happen, materialize during the trial." As a result, trial counsel was forced to prepare three different trial strategies and three different opening statements. Trial counsel stated that he believed that if Petitioner had authorized him to present a defense based on an accidental shooting, there was a good chance that Petitioner would have been convicted of a lesser offense.

Trial counsel felt the 911 tape, which was introduced as an exhibit at trial, was beneficial to Petitioner's case because Petitioner's son initially told the dispatcher that the shooting was an accident. Trial counsel cross-examined Josh Manning extensively at trial but made a tactical decision not to push any harder when Josh became emotional. Trial counsel felt that he thoroughly cross-examined Cindy Knopp regarding the 911 calls and brought out the points that were beneficial to Petitioner's defense. This specifically included the portions of the call in which Petitioner's son stated that the shooting was an accident. He did not feel the need to cross-examine Ms. Knopp about the second 911 phone call because it was not beneficial to Petitioner's defense.

Trial counsel felt he adequately cross-examined all of the witnesses and made every effort to highlight any evidentiary discrepancies. Trial counsel said that the State explored the discrepancies in the medical records during the presentation of its case-in-chief. Trial counsel said that once the victim's death had been established, he believed that it would not be effective to continue to probe into the minor inconsistencies in the medical records. Trial counsel stated that before concluding his cross-examination of each witness, trial counsel consulted with Petitioner to make sure Petitioner did not want him to ask any other questions or cover any other points.

19

On cross-examination, trial counsel testified that Petitioner was found incompetent to stand trial for a period of time and was medicated and confined to a treatment facility. Trial counsel then identified the autopsy photographs of the victim depicting a gunshot wound in the victim's side, and the photograph of the victim in her casket at the funeral home.

Trial counsel acknowledged that he followed up on several of Petitioner's leads, most of which proved to be "wild goose chases." Petitioner's claims were so "outrageous," that the defense team felt that they had to investigate every lead Petitioner suggested. Trial counsel tried to locate Ricky Green but was unsuccessful. Trial counsel also unsuccessfully tried to ascertain if the victim was alive and participating in the federal witness protection program. The investigation revealed no evidence that Petitioner's wife was still alive or that there was a conspiracy to convict Petitioner of her murder.

Trial counsel said that he pleaded with Petitioner to accept the State's offer to settle the charges with a recommended sentence of eighteen years in exchange for Petitioner's entry of a plea of guilty to second degree murder. Petitioner, however, refused to accept any plea offer that included a sentence of anything other than time served.

\* \* \*

David Brady testified that he supervised trial counsel in his capacity as District Public Defender. On one occasion, Mr. Brady met with trial counsel and Petitioner to discuss trial strategy. Mr. Brady experienced doubts as to Petitioner's competency during this meeting and recommended that Petitioner undergo another psychological evaluation prior to trial. The evaluation concluded that Petitioner was not competent to stand trial, and Petitioner was judicially committed to a treatment facility until such time as he was deemed competent to stand trial. On cross-examination, Mr. Brady testified that he fulfilled his obligations as an attorney with respect to Petitioner's representation, as did everyone under his supervision.

\* \* \*

Petitioner said that counsel was ineffective and refused to give him hospital records, police reports, or any recorded statements from witnesses. Petitioner said that during trial preparation, he essentially had to do "everything" himself without the aid of counsel.

Manning, 2007 WL 4116487 at \*\*4-6, 7, 9.

20

The Tennessee Court of Criminal Appeals then dismissed these claims reasoning as follows:

### A. Failure to Investigate

Petitioner contends that trial counsel provided ineffective assistance because "absolutely no evidence or witnesses were ever pursued or presented on behalf" of Petitioner. Trial counsel testified that he conducted a thorough investigation of Petitioner's case which included following up on all of Petitioner's suggestions. Trial counsel attempted to ascertain if the victim was still alive and to locate Mr. Green but was unsuccessful in either endeavor. Trial counsel reviewed all of the medical reports pertaining to the victim's treatment and death, and he met with Dr. Harlan and discussed the discrepancies in his autopsy report. Based on our review of the record, we conclude that trial counsel performance in this regard was not deficient.

### B. Failure to Secure Home Phone Records

Petitioner contends that his son, Joshua Manning, had an accomplice whom he called before the shooting, and the phone call would have been reflected in the phone records of his home telephone number. Trial counsel testified that he "went to great lengths" to attempt to subpoena the telephone records and was successful at obtaining those phone records that had not been destroyed in the normal course of business. Petitioner has failed to carry his burden in showing that his trial counsel was deficient in this regard.

### C. Failure to Introduce Results of Truth Serum Test

Trial Counsel testified that Petitioner insisted against counsel's advice that he participate in a truth serum test prior to trial. Petitioner asserts that:

while under the influence and control of the drug, sodium amytal, [Petitioner] clearly stated, without reservation that: ("He did not obtain a gun on the night in question"); ("That he did not fire a gun on the night in question"); and that: ("He did not injure or kill anyone on the night in question.")

Trial counsel testified, however, that Petitioner only spoke "gibberish" while under the influence of the administered drug. The post-conviction court accredited trial counsel's testimony and found that Petitioner offered no clear and convincing evidence to contradict trial counsel's testimony other than his own bare allegations. Petitioner is not entitled to relief on this issue.

21

### D. Failure to Verify that Petitioner was Drugged

Petitioner argues that he was drugged by his family prior to the shooting. Against counsel's advice, the alcohol in the bottle from which he had been drinking prior to the shooting was submitted for testing. The test did not reveal the presence of any drugs in the alcohol. Petitioner contends that the investigating officers threw the alcohol remaining in his glass down the sink, and if the alcohol had been tested, the presence of drugs would have been detected. Even assuming *arguendo* that this is was happened, trial counsel cannot be faulted for not submitting something for testing which no longer existed. Petitioner is not entitled to relief on this issue.

### E. Failure to Request the Exhumation of the Victim's Body

Petitioner contends that he repeatedly asked his trial counsel to file a motion requesting that the victim's body be exhumed so Petitioner could prove that there was either no body in the casket, or that the body in the casket was not the victim's. Petitioner asserts that trial counsel's assistance was ineffective for failing to do so. Petitioner filed a motion to exhume the victim's body during the pendency of the post-conviction proceeding. In arguing against the grant of the motion filed post-conviction the State pointed out:

[b]ack in 1999, this issue was raised with this Court by this defendant, and the Court denied exhuming the body at that time. It went on to trial two years later, there were witnesses from the family that, of course, said that they buried their mother and identified the body and had a funeral.

The post-conviction court denied Petitioner's motion. The exhumation of the body of a victim at the request of an accused is a matter within the discretion of the trial judge. <u>Dennis v. State</u>, 198 Tenn. 325, 279 S.W.2d 512 (1955).

22

Petitioner has failed to show that trial counsel's assistance in this regard was deficient.

## F. Ineffective Cross Examination

Petitioner argues that his trial counsel failed to effectively cross-examine the State's witnesses. Trial counsel testified at the evidentiary hearing that he thoroughly cross-examined the State's witnesses, including Dr. Harlan and Joshua Manning. Trial counsel said that he "pushed" Joshua as far as he could but made a tactical decision to end the cross-examination when Joshua's responses grew increasingly emotional. Trial counsel stated that at the conclusion of each witness's cross-examination, he gave Petitioner the opportunity to suggest any further questions before the witness was excused. The evidence does not preponderate against the post-conviction court's finding that Petitioner had presented nothing to suggest that trial counsel was ineffective during cross-examination. Petitioner is not entitled to relief on this issue.

Petitioner also alleges that his trial counsel was ineffective for stipulating to the introduction of the victim's medical records from Erlanger Hospital. The post-conviction court stated that:

> the Court allowed the entire medical record to come in to be examined and cross-examined and testified to by you or anyone else, and [trial] counsel here says that you wanted it in, and it came in. And [trial] counsel followed your wishes and defended in your-the way you wanted it, and he cannot be faulted for that.

Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel's assistance was not deficient in this regard. Petitioner is not entitled to relief on this issue.

## H. Failure to Present a Defense

Petitioner argues that the assistance of his trial counsel was ineffective because "no defense of any kind was presented for the [Petitioner]." Trial counsel testified that he advised Petitioner that:

> [they] should proceed on possibly that it was an accident, that [Petitioner was] under the influence of alcohol and basically drunk, and that the trigger was a hair trigger, and that it was an accident at best, possibly argue reckless homicide. You refused to let me argue any type of diminished capacity. In fact, one of the reasons I met with you every day prior to the trial was, you kept telling me that you would let us know what the defense is going to be when you took the stand, and that certain things would happen, materialize during the trial. You kept me in the dark about what your defense was going to be, so I prepared like three different strategies, three different opening statements, and you told me you'd let me know how to proceed, and it was basically very difficult, but we-you refused to accept any of our theories about how to proceed in the trial.

Petitioner acknowledged at the evidentiary hearing that he refused to let trial counsel assert a diminished capacity defense and reiterated that he did not kill anyone that night. The post-conviction court stated:

> [t]he thrust here is that the crime never happened, that the woman was not killed, she's still alive, and all the proof is to the contrary; and ... a defense lawyer would have been hard pressed to have argued to the jury with any degree of credibility that this never happened, it never happened, and under the circumstances [trial counsel] did the best he could, and there's nothing here to show contrary to that.

The evidence does not preponderate against the post-conviction court's finding that trial counsel's assistance was not deficient in this regard. Petitioner is not entitled to relief on this issue.

## VII. Ineffective Assistance of Appellate Counsel

24

Petitioner argues that assistance of his appellate counsel was deficient because he presented only six grounds for relief on appeal when there were "twenty-eight (28) actual and factual, constitutional violations of [Petitioner's] rights."

Appellate counsel testified that he appealed those issues which were supported by the record and legal argument, including Petitioner's right to present a defense through compulsory process. Appellate counsel acknowledged that he did not appeal Petitioner's conspiracy issue because no evidence was presented at trial to sustain this contention.

\* \* \*

The post-conviction court found that:

[appellate counsel] testified about, he appealed grounds that were supported by the facts and the law the best he could. I haven't seen anything here today that suggests there were other grounds that should have been argued. Conclusion on your part by that, but nothing here today to suggest what those 28 grounds were. The evidence does not preponderate against the post-conviction court's finding that Plaintiff has failed to establish by clear and convincing evidence that his appellate counsel's assistance was deficient. Petitioner is not entitled to relief on this issue.

Manning, 2007 WL 4116487 at \*\*16-18.

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims, in Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). In Mitchell, the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

25

In <u>United States v. Cronic</u>, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)... the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." <u>Cronic</u>, 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In <u>Williams</u>, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." <u>Williams</u>, 529 U.S. at 391 . . . (citing <u>Strickland</u>, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. <u>Olden</u>, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

*   *   *

Within the first category are three types of presumptive ineffectiveness of counsel:

The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" <u>Bell</u>, 122 S.Ct. at 1851 (quoting <u>Cronic</u>, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" <u>Id.</u> (quoting <u>Cronic</u>, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

<u>Id.</u> at 740, 742. Here, Petitioner's claims falls within the second category.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

26

deprive the defendant of a fair trial, a trial whose result is reliable. Unless a
defendant makes both showings, it cannot be said that the conviction or death
sentence resulted from a breakdown in the adversary process that renders the
result unreliable.

Id. at 687.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must

be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted,

"[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by

the defendant and on information supplied by the defendant. In particular, what investigation

decisions are reasonable depends critically on such information." Id. at 691 (emphasis added).

Yet, defense counsel's failure "to conduct constitutionally adequate pretrial investigation into

potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell,

417 F.3d 631, 639 (6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.

1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the

attorney has failed to investigate his options and make a reasonable choice between them.").

As to Petitioner's failure to investigate claims, the state appellate court's findings quoted

supra at pp 7-8, reflect that trial and appellate counsel vigorously pursued the subpoena issue at

trial and on direct appeal. Petitioner's trial counsel actually secured and reviewed all of the

relevant and available medical and telephone records. Manning, 2007 WL 4116487, at *16.

Counsel attempted unsuccessfully to find Mr. Green whom Petitioner identified as a possible

defense witness, but trial counsel interviewed Dr. Harlan and reviewed the medical records with

27

him.  Contrary to Petitioner's insistence, the testing of the bottle of alcohol from which he was drinking shortly before the shooting did not reveal any drugs.  Counsel deemed Petitioner's responses under the truth serum to be "gibberish" and unreliable as defense proof.  Although Petitioner insisted that his defense was that the victim was not dead, by accounts of witnesses, including the victim's daughter, the victim was dead.  As to Petitioner's allegation that his counsel failed to present "12 witnesses that were left over,"  (Docket Entry No. 57, at 3), however, Petitioner does not offer any proof as to the relevance of these witnesses or what the substance of the proposed testimony of each witness.  The state courts reasonably concluded that these cited deficiencies of his trial counsel do not arise to a Sixth Amendment violation.

As to deficiencies of his appellate counsel on direct appeal, in <u>Murray v. Carrier</u>, 477 U.S. 478, 487 (1986), the Supreme Court made it clear that appellate counsel's ignorance or the inadvertence or as a result of a deliberate appellate strategy not to raise a "particular claim" would not show prejudice to excuse procedural default of a claim.  "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default."  <u>Id.</u> at 486-87.  As to the failure to raise a claim on appeal, the Supreme Court also observed that "[t]his process of `winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of noncompliance, is the hallmark of effective appellate advocacy.  <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).

Petitioner's appellate counsel pursued the subpoena issue.  Petitioner's appellate counsel could not find any factual bases for any conspiracy between the state prosecutor and judge.  In the post-conviction proceeding, Petitioner never presented proof of such a conspiracy.  Under

28

these circumstance, the state courts' denials of this claim about Petitioner's appellate was reasonable under applicable federal law.

In sum, based on the state court record, the Court concludes that the states courts could reasonably conclude that Petitioner has not presented sufficient evidence that his counsel's performance was either deficient or prejudicial.

## 2. DEFAULTED CLAIMS

Respondent contends that certain of Petitioner's ineffective assistance of counsel claims are procedurally defaulted, namely that: (1) trial counsel inappropriately deferred to Petitioner on various matters of trial strategy even though Petitioner was either incompetent or marginally competent, was possibly mentally ill, and showed signs of delusional thinking; (2) trial counsel failed to challenge adequately Petitioner 's competence to stand trial; and (3) trial counsel failed to investigate adequately the incident resulting in Jackie Manning's death, Petitioner's mental state at the time of the incident, or Petitioner's mental state and potential incompetency at the time of trial; and (4) trial counsel failed to put on all supporting evidence that Petitioner was not guilty of first-degree, intentional, premeditated murder. Because these claims were never presented to the state courts, Respondent contends that their claims are procedurally barred and are otherwise without merit.

As discussed earlier, a habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues with some reference to federal law. Duncan, 513 U.S. at 365-66. This standard is related to "the doctrine of exhaustion [that] requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998). As a matter of federal law,

29

to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. Covington v Mills, 110 Fed. Appx. 663, 666 (6th Cir. 2004). Those claims must be presented within the time provided by state law or an unexhausted claim becomes a procedurally defaulted claim. Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006).

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas proceedings as barring federal habeas relief in certain instances, stating:

> This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory.
>
> * * *
>
> The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural grounds.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

The rationale for this doctrine arises out of judicial respect for federalism and maintaining comity with state courts, id. at 730-32, and the doctrine also serves a legitimate state interest in finality of state convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so "deprives the [state] appellate court of an opportunity to review

30

trial error, and 'undercut[s] the State's ability to enforce its procedural rule[s].'" Murray v.

Carrier, 477 U.S. 478, 491 (1986) (quoting Engle v. Isaac, 456 U.S. 107, 129 (1982)).

As the Sixth Circuit stated in Williams, there are two types of procedural default in

habeas actions:

> First, a petitioner may procedurally default a claim by failing to comply with
> state procedural rules in presenting his claim to the appropriate state court.
> Lundgren v. Mitchell, 440 F.3d 754, 763 (6th Cir. 2006) (citing Washington v.
> Sykes, 433 U.S. 72, 87, 97 (1977)); see also Maupin v. Smith, 758 F.2d 135, 138
> (6th Cir. 1986). If, due to the petitioner's failure to comply with the procedural
> rule, the state court declines to reach the merits of the issue, and the state
> procedural rule is an independent and adequate grounds for precluding relief, the
> claim is procedurally defaulted. Id.
>
> Second, a petitioner may procedurally default a claim by failing to raise a claim
> in state court, and pursue that claim through the state's "ordinary appellate review
> procedures." O'Sullivan v. Boerckel, 526 U.S. 838, 848-7 (1999). If, at the time
> of the federal habeas petition, state law no longer allows the petitioner to raise
> the claim, the claim is procedurally defaulted. Engle v. Isaac, 456 U.S. 107, 125
> n. 28 (1982); see also Coleman v. Thompson, 501 U.S. at 731-32. This second
> type of procedural default is often confused with exhaustion. Exhaustion and
> procedural default, however, are distinct concepts. AEDPA's exhaustion
> requirement only "refers to remedies still available at the time of the federal
> petition." Engle, 456 U.S. at 125 n.28. Where state court remedies are no longer
> available to a petitioner because he or she failed to use them within the required
> time period, procedural default and not exhaustion bars federal court review. Id.

Id. at 806. Petitioner's defaulted claims fall into both categories.

The Sixth Circuit defined the analysis under the procedural default doctrine in Maupin v.

Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to
> observe a state procedural rule, the federal court must go through a complicated
> analysis. First, the court must determine that there is a state procedural rule that
> is applicable to the petitioner's claim and that the petitioner failed to comply with
> the rule.

*\*\*\**

31

Second, the court must decide whether the state courts actually enforced the state procedural sanction.

***

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (citations omitted).

Petitioner did not present these grounds for his ineffective assistance of counsel claim before the state courts and under state rules those claims are waived under Tenn. Code Ann. § 40-30-106(g) by virtue of his direct and post-conviction appeal and are also time barred under Tenn. Code Ann. § 40-30-102(a).

Procedural rules such as statutes of limitations have been found to be independent and adequate. In Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. In Brown v. Allen, 344 U.S. 443 at 485-86 (1953), the Court also applied the procedural default rule to a state rule that placed time limits on appellate rights. Accord Reed v. Farley, 114 S.Ct. 2291 (1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers by failure to object at trial and to establish prejudice).

In Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations on post-conviction petitions and Burford exception in a procedural default analysis:

Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to Burford demonstrates that state procedural rules are not regularly followed in the context of later-arising claims.

32

Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in Burford and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented . . .

In Hannah v. Conley, 49 F.3d 1193 (6 th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. Id. at 1197. The Hannah court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. Id. at 1196. The current one-year statute of limitations contains the same mandatory language. See T.C.A. § 40-30-202(a).

Although the previous cases did not present a Burford type later arising claim, we do not find that the state's Burford tolling rules command a different result. . . .

Given that tolling under Burford is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the Burford exception does not render Tennessee's procedural rules inadequate.

Id. at 738-739. (footnotes omitted).

The Sixth Circuit also ruled in Hutchinson that despite the Burford exception to the Tennessee timeliness rule, Burford was not a separate constitutional claim. Id. at 740-41. In a word, Hutchinson found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an independent and regularly enforced state rule.

The Sixth Circuit has also found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v.

33

Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002)).  Thus, the Court concludes that Petitioner's claims that Respondent challenges are procedurally defaulted.  Williams, 460 F.3d at 86.

With these procedural defaults, Petitioner must  show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  Cause for a procedural default must depend on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule.  Id. at 753.  "Prejudice . . .  requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions."  Jamison v. Collins, 291 F.3d 380, 388 (6th Cir. 2002) (citing United States v. Frady, 456 U.S. 152, 170-71 (1982)).  A fundamental miscarriage of justice requires a showing that the alleged "constitutional violation has probably resulted in the conviction of one who is actually innocent."  Murray, 477 U.S. at 496.  This exception applies only in "extraordinary case[s]."  Id.

Petitioner's next claim of  ineffective assistance of counsel is that his counsel failed to investigate his competence and that Petitioner was not competent to stand trial when his case was finally presented to a jury, depriving him of the ability to consult with his lawyer with a reasonable degree of rational understanding and in turn hampering his lawyer's ability to provide effective representation.  Respondent also contends that these claims also were never presented to the state courts and are procedurally barred and is otherwise without merit.

34

The procedural default doctrine may not preclude federal habeas review if failure to hear the petitioner's would result in a fundamental miscarriage of justice or actual innocence. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly discovered evidence, then the petitioner's showing of actual innocence must be "truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, 506 U.S. 390, 427 (1993).

Petitioner's trial counsel moved for a re-evaluation of Petitioner's competency by mental health officials and also requested the petitioner be evaluated for his sanity at the time of the offense. For a time, the petitioner was determined not competent to stand trial and was committed for treatment, but was later deemed competent by mental health providers. (Docket Entry No. 34, Attachment 1 at 27-29, 31-34, 37-38, 62, 64-66). Mental health providers also determined that the petitioner's mental condition at the time of the offense did not meet the criteria for the insanity defense. (Docket Entry No. 34, Attachment 1 at 59). Further, the trial court ordered several times that the petitioner be evaluated for his competency to stand trial and that the petitioner was first committed for treatment, but was later found competent by mental health professionals. (Docket Entry No. 34, Attachment 1 at 27-29, 31-34, 37-38, 62, 64-66, 75-76, 79).

Petitioner does not assert cause as to why his ineffective assistance counsel claims were not presented in the state courts. Moreover, Petitioner fails to show any prejudice attributable to his counsel for these defaulted claims. In these circumstances, the Court concludes that these

claim do not rise to the level of a miscarriage of justice to excuse Petitioner's procedural default on these claims.

Petitioner next asserts that the trial court erroneously instructed the jury on the requisite intent for first-degree murder, but that claim was presented as a state law claim. Petitioner now contends in the Tennessee appellate courts that the erroneous jury instruction relieved the prosecution of its constitutional burden of proving all elements of first-degree murder beyond a reasonable doubt in violation of federal law. Petitioner also argues that this instruction was highly prejudicial and not harmless, because there was significant evidence before the jury that Petitioner was mentally disturbed; that the killing was an accident; that Petitioner was shocked and intoxicated at the time of the shooting.

To the extent that this issue may present a miscarriage of justice to excuse Petitioner's default on this claim, the Tennessee Court of Criminal Appeals addressed this issue as a state law claim and ruled as follows:

> In pertinent part, the trial court charged the jury that, in order to find the Defendant guilty of first degree premeditated murder, it had to determine that the Defendant "acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" The Defendant contends that the trial court committed reversible error by referring to "the nature of the conduct." The Defendant argues that, pursuant to this Court's decision in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), the trial court should have charged the jury as follows: "A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." Id. at 790 app. The State concedes that the trial court's instruction was erroneous, but maintains that the error is harmless beyond a reasonable doubt.
>
> In Page, the defendant was convicted of second degree murder: the "knowing killing of another." Tenn.Code Ann. § 39-13-210(a)(1). This Court reversed the Defendant's conviction because the trial court instructed the jury that a person acts "knowingly" if the person acts with an awareness: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the

36

conduct was reasonably certain to cause the result. See Page, 81 S.W.3d 786. Recognizing that second degree murder is a result-of-conduct crime, see State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), this Court determined that "[t]he result of the conduct is the only conduct element of the offense; the 'nature of the conduct' that causes death is inconsequential." Page, 81 S.W.3d at 787. Because the jury charge permitted the jury to convict the defendant based upon his awareness of the nature of his conduct or upon the circumstances surrounding his conduct, the State's burden of proof was improperly lessened. See Id. at 788. Applying a constitutional harmless error analysis, see Id. at 789, this Court determined that the error required reversal because the defendant's mens rea was "the disputed issue at trial." Id.

This Court has previously considered the holding of Page in the context of a conviction for first degree premeditated murder. See State v. Antoinette Hill, No. E2001-02524-CCA-R3-CD, 2002 WL 31780718 (Tenn. Crim. App., Knoxville, Dec. 13, 2002). As set forth above, the mens rea requirement for this form of murder is premeditated and intentional. Our criminal code defines "intentional" as referring to a person "who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (emphasis added). However, first degree premeditated murder, like second degree murder, is a result-of-conduct offense. See State v. Antoinette Hill, 2002 WL 31780718, at *5. Therefore, with respect to first degree premeditated murder, the first of the two disjunctive definitions is irrelevant.

Thus, the jury instruction provided in this case contained an irrelevant definition. More importantly, the irrelevant definition given in this case was erroneous because it provided the jury an opportunity to convict the Defendant based only on his awareness of the nature of his conduct: an improper lessening of the State's burden of proof. See Page, 81 S.W.3d at 788. To be convicted of first degree premeditated murder, a defendant must be aware that his or her conduct is reasonably certain to cause death. See Id.

Given that the trial court's instruction on the definition of intentional was erroneous, we must now determine whether that error was harmless beyond a reasonable doubt. We conclude that it was. As noted by this Court in Antoinette Hill, a conviction of first degree premeditated murder indicates that the jury necessarily concluded that the defendant "displayed a previously formed design or intent to kill." 2002 WL 31780718, at *5. As set forth above, the jury's conclusion in this regard is supported by sufficient evidence. Moreover, the Defendant's theory of defense in this case did not hinge on his mens rea, as did the theory of defense in Page. In Page, the defendant conceded that he had committed the killing. See 81 S.W.3d at 789. He contended, however, that he had been drunk when he hit the victim with a baseball bat, and he hadn't meant to hit

37

the victim "that hard." Id. The Defendant in this case did not concede that he had committed the killing but claimed that he couldn't remember what had happened to his wife or how she came to be shot. Prior to trial, the Defendant tried to place the blame for the killing on his own son. In short, the Defendant's theory of defense was that he didn't think he shot the victim "at all," not that he shot her while in a drunken rage. In light of these factors, we hold that the trial court's erroneous instruction to the jury was harmless beyond a reasonable doubt, and this issue is therefore without merit.

Manning, 2003 WL 354510, at *7-8. The Court concludes that this claim is procedurally defaulted because it was presented solely as a state law claim.

As to the miscarriage of justice exception, for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a habeas petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, the issue is whether, taken as a whole, the jury instructions are so infirm that they rendered the entire trial fundamentally unfair. Henderson v. Kibbe, 431 U.S. 145, 154 (1977). See also Estelle, 502 U.S. 62, 72, 73 (1991) ("[w]e also bear in mind our previous admonition that we `have defined the category of infractions that violate "fundamental fairness" very narrowly,'") (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).

An example of jury instructions offending this constitutional limitation is Sandstrom v. Montana, 442 U.S. 510, 524 (1979), the Supreme Court ruled unconstitutional a jury instruction that presumes a person intends to commit the natural, ordinary and usual consequences of his voluntary actions. If the habeas petitioner had counsel, where an impartial adjudicator and the evidence proved guilt of the offense beyond a reasonable doubt, a strong presumption arises that the Sandstrom error is harmless. Neder v. United States, 527 U. S. 1, 8 (1999); Rose v. Clark, 478 U.S. 570, 579-80 (1986)

Based upon the state appellate court analyses and their findings that Petitioner's counsel provided effective assistance, the Court concludes that under the facts of this case that any jury instruction error was harmless and the state courts could so reasonably conclude.

Petitioner's Brady claim is that the State withheld material exculpatory evidence that the conclusions of its medical examiner, Charles Harlan, were unreliable that Dr. Harlan testified falsely that he had performed 27,500 autopsies and that the State also withheld material and exculpatory evidence undermining its theory that the petitioner acted intentionally and with premeditation.

A Brady claim can qualify as cause to excuse a procedural default, and a similar standard applies as the Sixth Circuit stated:

> Suppression or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default. Id. The petitioner need not show that the prosecutor acted in bad faith or that defense counsel made a specific request for evidence . . . However, unless the alleged Brady evidence is "material" for the purposes of the Brady rule, its "suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default." (quoting Strickland v. Greene, 527 U.S. 263, 282 (1999).

Hutchinson v. Bell, 303 F.3d 720, 741 (6th Cir. 2002).

In Brady, the Supreme Court held that the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Later, the Supreme Court restated the elements of a Brady violation. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is

39

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

To warrant federal habeas relief on this claim, this evidence must satisfy the standard that Petitioner's trial resulted "in a verdict unworthy of confidence" i.e., "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict based upon a "'. . . reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Strickler, 527 U.S. at 289, 290 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995).

"[T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Brady principle extends to impeachment evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). Moreover, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). In addition, the prosecutor's obligation under Brady and its progeny requires the disclosure of exculpatory and/or impeachment evidence without a defense request. United States v. Agurs, 427 U.S. 97, 107 (1976).

In sum, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler, 527 U.S. at 281-82. Unless the alleged Brady evidence

40

is "material" for the purposes of the <u>Brady</u> rule, its "suppression [does] not give rise to sufficient prejudice to overcome the procedural default." <u>Id.</u> at 282. To show prejudice, the petition need not show that the prosecutor acted in bad faith or that defense counsel made a specific request for evidence. <u>Bagley</u>, 473 U.S. at 682. It is sufficient to establish prejudice if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," <u>Bagley</u>, 473 U.S. at 682, or "undermines confidence in the outcome of the trial." <u>Kyles</u>, 514 U.S. at 437 (quoting <u>Bagley</u>, 473 U.S. at 678).

Dr. Harlan performed the autopsy on the victim and testified that the victim died as the result of a shotgun wound to her abdomen. There was ample independent evidence in the state record that Petitioner shot the victim and that the victim, in fact, died. Thus, Petitioner fails to establish this alleged <u>Brady</u> evidence is material so as to excuse his procedural default.

For the reasons stated above, the Respondent's motion to dismiss (Docket Entry No. 49) should be granted; the petitioner's motion for an evidentiary hearing (Docket Entry No. 57) should be denied; the petition should be denied; and this action should be dismissed.

An appropriate Order is filed herewith.

ENTERED this the _29th_ day of June, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge